# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

SJ PROPERTIES SUITES, BUYCO, EHF.,
SJ-FASTEIGNIR, EHF, and,
ASKAR CAPITAL, HF,

                        **Plaintiffs,**

                                                   **Case No. 10-C-00198**

        -vs-

SPECIALTY FINANCE GROUP, LLC,

                        **Defendant.**

---

## DECISION AND ORDER

---

        This Decision and Order addresses Defendant Specialty Finance Group, LLC's ("SFG") motion to dismiss the Amended Complaint (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Problems related to an ill-timed construction loan agreement for a 14-story mixed-use real estate development project located at 1150 North Water Street, in downtown Milwaukee, Wisconsin (the "Project") are at the core of this litigation commenced by the Plaintiffs, SJ Properties Suites; BuyCo, ehf ("BuyCo"); SJ-Fasteignir, ehf ("Fasteignir"); and Askar Capital, hf, ("Askar") (collectively the "Icelandic Entities" or the "Plaintiffs").

        The 49-page, 239-paragraph Complaint asserts claims for unjust enrichment (Count I), promissory estoppel (Count II), violations of Subchapter III of Wisconsin Statutes

Chapter 224 (Count III), unclean hands (Count IV), a declaration of rights under Wisconsin Statutes § 840.03 (Count V), a declaration of rights under Wisconsin Statutes § 841.01 (Count VI), and interference with interest and physical injury to real property (Count VII).

The factual allegations underlying this action span a four-year period and involve a number of entities and contracts. However, in a nutshell, the claims are based on allegations that SFG failed to fully fund its construction loan for the Project and SFG subsequently coerced the Icelandic Entities to advance monies for the Project. The Icelandic Entities maintain that SFG notified them of events of default due to cost overruns, caused them to provide emergency cash to the Project, and that, when the Project eventually collapsed, SFG refused to allow them to continue making payments on the loan.

**Motion to Dismiss**

SFG seeks dismissal of the entire Complaint. SFG contends that the Icelandic Entities' claims for unjust enrichment (Count I), promissory estoppel (Count II), and most of the claim alleging violations of Subchapter III of Wisconsin Statutes Chapter 224 (Count III) are barred, and that all counts fail to state a cause of action.

For purposes of the pending motion to dismiss, the Court accepts the factual allegations in Icelandic Entities' Complaint as true and draws all reasonable inferences in favor of the Plaintiffs. *See Ray v. City of Chicago*, 629 F.3d 660, 662 (7th Cir.) *cert. denied*, __ U.S. __, 132 S.Ct. 100 (2011). To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As the court of appeals for this circuit has stated "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950. In performing this analysis, courts need not accept as true any legal conclusions or conclusory statements included in the complaint. *Id.* at 1949-50. The Court will, however, accept as true all well-pleaded factual allegations, and will draw all reasonable inferences in the plaintiff's favor. *Ray*, 629 F.3d at 662. If the allegations of the complaint "fail[ ] to state a claim upon which relief can be granted," the complaint will be dismissed. Fed. R. Civ. P. 12(b).

*Background*[1]

BuyCo and Fasteignir are Icelandic private limited companies, referred to as an einkahlutafélag ("ehf"), whose principal offices are located in Reykjavík, Iceland. (Compl. ¶¶ 1-3.) (ECF No. 44.) Askar is an Icelandic limited company, referred to as a

---

[1]The facts are derived from the allegations of the Complaint. SFG has not filed an answer to the Complaint. However, by its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), SFG disputes many of the allegations of the Complaint.

hlutafélag ("hf"), whose principal office is also located in Reykjavík, Iceland. (*Id*. at ¶ 3.)

BuyCo and Fasteignir advanced funds for the Project. (*Id*. at ¶¶ 1-2.) Askar provided

"mezzanine financing" for the loan. (*Id*. at ¶ 3.)

SFG is a Georgia unchartered limited liability company whose principal office

is located in Atlanta, Georgia. (*Id*. at ¶¶ 4, 23.) SFG was, and is, a wholly owned subsidiary

of Silverton Bank N.A ("Silverton").[2] (*Id*. at ¶ 23.) SFG was created to target the financing

needs of the hospitality industry. (*Id*.)

Neither Silverton nor SFG ever submitted to any type of regulation by the State

of Wisconsin, including, without limitation, regulation by the Wisconsin Department of

Financial Institutions ("DFI"), Division of Banking, as of the date SFG issued the loan

commitment or at any other time. (*Id*. at ¶ 36.) SFG has not registered as a mortgage banker

or broker in Georgia or any state. (*Id*. at ¶ 35.) In *Specialty Finance Group LLC v. DOC*

*Milwaukee LP et al.*, No. 10-C-315 (E.D. Wis.) (the "315 action"), SFG alleged that it is a

"mortgage banker" under Wisconsin Statutes §§ 706.11(1)(f) and 224.71(3). (*See id*. at

¶ 41(citing the 315 action Compl. (ECF No. 1), ¶¶ 39 & 50).)

On approximately November 9, 2006, DOC Milwaukee, LP ("DOC

Milwaukee") was created to acquire and develop the property located at 1150 North Water

Street (the"Property"). (*Id*. at ¶ 26.) When DOC Milwaukee was formed, its partners were

---

[2]Silverton began as Georgia Banker's Bank which was originally charted as a commercial bank with the State of Georgia. (Compl. ¶ 22.) In 1994, the bank changed its name to The Banker's Bank, but its charter remained with the State of Georgia. (*Id*.) In 2007, The Banker's Bank changed its name to Silverton. (*Id*.) For purposes of this Decision and Order, each iteration of The Banker's Bank and Silverton Bank, N.A., is referred to as "Silverton." (*Id*.)

-4-

as follows: (1) DOC Milwaukee II, LLC, as the initial general partner; (2) Development Opportunity Corp., as a limited partner; (3) EP Milwaukee, LLC, as a limited partner; and (4) BuyCo, as a limited partner. (*Id*.)

DOC Milwaukee received a loan commitment on March 29, 2007, from SFG to advance a $20,900,000 loan for the Project. (*Id*. at ¶ 37.) Under the terms of the loan commitment, SFG was to fund a loan amount "Not to Exceed $20,900,000.00," provided that DOC Milwaukee made equity contributions equal to 25% of the Project's cost, with a minimum equity contribution of $6,993,302.00. (*Id*. at ¶ 32.) The minimum equity contribution however, established a 33.4% loan to value ratio. (*Id*.) When the loan commitment was issued, the loan to value ratio exceeded the 20% loan to value ratio for commercial construction required under the Interagency Guidelines for Real Estate Lending Policies ("Interagency Guidelines") by 13.4%. (*Id*. at ¶ 33.) At the time of the loan commitment's execution, it was contemplated that the loan documents would be immediately forthcoming and that the loan would close on or before April 6, 2007. (*Id*. at ¶ 34.)

On April 2, 2007, three days after the issuance of the loan commitment, Silverton submitted an application to the Office of the Comptroller of the Currency (the "OCC") requesting permission to convert from a Georgia chartered commercial bank to a national association. (*Id*. at ¶ 56.) Silverton's conversion application disclosed SFG as its wholly owned subsidiary. (*Id*.) It did not identify SFG as a registered or licensed mortgage banker in any jurisdiction, including Georgia or Wisconsin. (*Id*.)

Silverton's subsequent periodic regulatory disclosures made to the OCC did not identify SFG as a registered or licensed mortgage banker in any jurisdiction, including Georgia or Wisconsin. (*Id.* at ¶ 59.) As a result of Silverton's attempt to convert to a national association, it was required to submit to the OCC's jurisdiction and rules, as the OCC was Silverton's primary regulator. (*Id.*) National Banks and National Associations also must be members of the Federal Reserve System ("Federal Reserve") and the FDIC. (*Id.* at ¶ 10.)

By submitting to the OCC's regulation, Silverton and its subsidiaries, including SFG, also agreed to submit to the internal loan to value ratio established by 12 C.F.R. § 34, including the Interagency Guidelines that are incorporated by reference, 12 U.S.C. § 1828(o), and the Comptroller's Commercial Real Estate and Construction Lending Handbook (the "Comptroller's Handbook"). (*Id.* at ¶ 60.) Regulation by the OCC also prohibits insolvent banks from using federal foreclosure procedures if a receiver is appointed to administer assets of an insolvent national association. (*Id.* at ¶ 61.) The loan to value ratio established by the loan commitment exceeded those established by the Interagency Guidelines by 13.4%. (*Id.* at ¶ 62.)[3]

On May 14, 2007, the OCC began its pre-conversion evaluation. (*Id.* at ¶ 65.) On June 5, 2007, in an internal memorandum, OCC examiners expressed concerns with

___

[3]The Interagency Guidelines establish exemptions from this rule, one of the exemptions applies to loans issued by the bank in a jurisdiction in which the bank has specifically consented to state regulatory requirements and jurisdiction. (Compl. ¶ 63.) Neither Silverton nor SFG ever disclosed the loan made for the Project as an excluded loan from the supervisory loan to value limits, or an excepted loan under the Exceptions to the General Lending Policy. (Id. at ¶ 64.)

Silverton's credit risk management processes, strategic planning, and capital planning. (*Id.* at ¶ 68.) At about the same time, the OCC determined that there were significant weaknesses in Silverton's banking practices, including compliance with regulatory capital requirements and statutory loan criteria. (*Id.* at ¶ 69.)

On June 18, and June 26, 2007, the OCC officials met with Silverton's management to discuss their concerns. (*Id.* at ¶ 70.) The OCC reported to Silverton that its investigation noted unsafe and unsound underwriting and credit administration practices, including inadequate capitalization of loans, construction draw monitoring, and a lack of compliance with loan to value ratios. (*Id.* at ¶ 71.) The OCC examiner's review reported significant weaknesses in Silverton's portfolio and requested that Silverton review its business plan to reduce the risk, particularly of its construction loans. (*Id.* at ¶ 72.) The concerns expressed in the June 2007, meetings were later memorialized in a July 26, 2007, letter that, among other matters, recommended changes to Silverton's lending practices. (*Id.* at ¶ 70.)

On August 7, 2007, the OCC approved Silverton's application for conversion to a national association, conditioned upon Silverton's agreement to address the concerns in the OCC's July 26, 2007, letter. (*Id.* at ¶ 73.) Silverton was formally converted to a national association on August 17, 2007. (*Id.* at ¶ 74.) As of August 17, 2007, the OCC reassigned Silverton from its Birmingham office to the Atlanta office for supervision. (*Id.* at ¶ 79.)

From August 17, 2007, until late November 2007, there was a gap of about 90 days in the supervision of Silverton. (*Id*. at ¶ 79.)

Silverton disclosed SFG as a wholly owned and operated subsidiary, established as a limited liability company that made direct commercial loans to the hospitality industry. (*Id*. at ¶ 76.) This list was not amended and at no time did Silverton advise the OCC that either it or its subsidiaries or branches maintained offices within Wisconsin. (*Id*.) Silverton also did not amend its disclosures to indicate that SFG was engaged in the business of mortgage banking or serving as a mortgage banker in any state, including Wisconsin. (*Id*.) A significant benefit of having SFG operate as a limited liability company that was the wholly owned subsidiary of a national association is that SFG could avoid having to register or obtain a license from state lending and banking regulators when SFG made loans for projects outside of Georgia. (*Id*. at ¶ 77.)

In October 2007, SFG presented a loan agreement for DOC Milwaukee to sign based upon the terms of the loan commitment, which contemplated a $20,900,000 loan with a minimum 25% equity requirement. (*Id*. at ¶ 84.) Days later, SFG advised that it would be unable to sign the document. (*Id*.)

In October 2007, SFG also retained Broadlands Financial Group, LLC ("Broadlands") to serve as a lender services agent for the Project. (*Id*. at ¶ 85.) By October 2007, SFG was aware that a number of subcontractors had visibly commenced work at the Project. (*Id*. at ¶ 86.)

-8-

By the end of November 2007, the supervisory gap at the OCC was filled, and the OCC ordered a full-scope examination of Silverton and SFG. (*Id*. at ¶ 87.) The OCC began reviewing new loans and problem loans, assessing lending area risk, and conducting a targeted examination of lending risk and asset quality. (*Id*.) Particular attention was given by the OCC to loan to value ratios and asset quality. (*Id*.) As part of the evaluation process, the OCC identified Silverton and SFG loans that potentially fell outside of its commitments made to the OCC pre-conversion. (*Id.*)

As a result of pressures from regulators, and to stem its own losses, Silverton and its wholly owned subsidiary, SFG, began to "aggressively restrict" its loans to comply with federal lending guidelines, and attempted to obtain additional equity contributions from its borrowers to bring its total portfolio loan to value numbers into line. (*Id*. at ¶ 88.)

In November 2007, SFG advised DOC Milwaukee that it could not sign the loan agreement because its parent company, Silverton, was unwilling to provide funding for the loan. (*Id*. at ¶ 89.) SFG offered to issue a loan for a lower dollar amount and promised that it would issue a new loan based upon the original loan commitment promptly after Silverton's issues were worked out. (*Id*.) When SFG so advised DOC Milwaukee, SFG was aware that the Project was already under construction. (*Id*. at ¶ 90.) To keep the Project going, the Icelandic Entities stepped in and advanced additional emergency cash. (*Id*.)

On January 9, 2008, SFG and DOC Milwaukee entered into a new loan agreement for a lower amount – $14,900,000.00 (the "SFG loan agreement"). (*Id*. at ¶ 91.)

The SFG loan agreement contemplated that DOC Milwaukee would make a borrower's equity contribution of $12,993,302 or 25% of the total cost of the Project. (*Id*. at ¶ 95.) Under the SFG loan agreement, Broadlands was to provide construction risk management services including Project oversight and contract funds administration. (*Id*. at ¶ 100.)

By January 2008, immediately prior to the execution of the SFG loan agreement, the OCC was reporting significant concerns over Silverton's viability. (*Id*. at ¶107.) Despite the fact that the loan had closed, the mortgage had been recorded, and the Project was over 60% complete, SFG failed to fund the first draw request. (*Id*.) By April 24, 2008, the OCC's target examination reported that Silverton's asset quality had significantly deteriorated, and for the first time, expressed concerns about Silverton's continued viability. (*Id*. at ¶ 110.)

About the same time in April 2008, SFG informed DOC Milwaukee that DOC Milwaukee was in default of the SFG loan agreement citing "unauthorized cost overruns." (*Id*. at ¶ 111.) None of the alleged "cost overruns" were unknown events and, before the loan closed, they had been fully disclosed by HMS Victory, LLC[4] ("Victory") to SFG and Broadlands. (*Id*.) In addition, the purported cost overrun reflected an amount to complete that was less than the "Cost Breakdown" contained in the SFG loan agreement. (*Id*.)

At the time of the first default notice in April 2008, SFG had advanced $7,605,866.98 (*Id*. at ¶ 113.) DOC Milwaukee was not in default of the SFG loan agreement

[4]Victory performed an evaluation of the Project's contractor, Economou Partners Construction, Inc. ("Economou Partners Construction") and the Project.

-10-

due to any delinquencies in payments on the interest or principal that SFG had advanced. (*Id.* at ¶ 114.) SFG then threatened the Plaintiffs that if they did not advance additional funds to DOC Milwaukee for the Project, SFG would wipe out their interest in the Project. (*Id.*)

On June 2, 2008, the OCC ordered a full-scope safety and soundness evaluation of Silverton and SFG. (*Id.* at ¶ 116.) The FDIC and OCC pressured Silverton — and the FDIC, OCC and Silverton pressured SFG — to improve its loan to value ratios for its overall portfolio. (*Id.*) Despite additional cash advances to buttress its equity cushion, Silverton and SFG continued to experience sagging loan to value ratios for its portfolio and continued to demand additional cash be infused into the Project. (*Id.* at ¶ 117.)

In September 2008, SFG demanded that DOC Milwaukee or its partners or lenders advance yet another $4,000,000.00 of additional equity into the Project in order to obtain SFG's agreement not to foreclose. (*Id.* at ¶ 118) At the time, DOC Milwaukee was current on principal and interest payments, the Project was 80% complete and was still operating under the budget that had been disclosed to SFG prior to the execution of the SFG loan agreement. SFG promised that if the Icelandic Entities advanced additional emergency funds, SFG would forbear and also fund the remaining principal balance of the SFG loan agreement. (*Id.*) These demands were not made in good faith and the Icelandic Entities "were forced to manifest assent to the transaction out of fear of their entire investment in the Project being wiped out." (*Id.*)

-11-

On October 8, 2008, SFG and DOC Milwaukee entered into a forbearance agreement. (*Id*. at ¶ 119.) The first forbearance agreement was also signed by the guarantors, Phil Hugh ("Hugh"), John Economou ("J. Economou"), and Steve Economou ("S. Economou"). (*Id*.) The Icelandic Entities were not parties to the first forbearance agreement. (*Id*.)

On October 24, 2008, Silverton Financial Services, Inc., Silverton's holding company, filed an application for $77,300,000.00 under the Troubled Asset Relief Program ("TARP"). (*Id*. at ¶ 120.) As of that date, the OCC began evaluating Silverton for a possible Federal Deposit Insurance Corporation ("FDIC") receivership. (*Id*.) On November 24, 2008, the OCC advised of its decision not to recommend approval of the TARP application. (*Id*. at ¶ 121.) However, on December 12, 2008, the OCC determined that Silverton should be deemed in a troubled condition, and transferred supervision of the bank to the OCC's Special Supervision Division in Washington, D.C. (*Id*.)

On February 2, 2009, the OCC began a targeted examination of all loans, including those made by SFG. (*Id*.) On about February 10, 2009, SFG again informed DOC Milwaukee that it was in default on the SFG loan agreement, once more citing the failure to infuse additional equity into the Project. (*Id*. at ¶ 123.) As of that date, SFG had advanced $13,431,373.42 on the SFG loan agreement while the Icelandic Entities had advanced $17,419,807.75 through equity contributions and loans to DOC Milwaukee to complete the Project, or a 57% cushion. (*Id*. at ¶ 124.) At the time, the loan to value ratio was less than

-12-

43%, well inside the 80% established in the Interagency Guidelines. (*Id*. at ¶ 125.) In February 2009, when SFG declared the loan in default, DOC Milwaukee was not delinquent in any payments on the principal or interest on the SFG loan agreement. (*Id*. at ¶ 126.)

Despite having adequate protection, SFG again threatened to accelerate the SFG loan agreement, which would have required DOC Milwaukee to advance $13,431,373.42 within days or face foreclosure. (*Id*. at ¶ 127.) Without justification, officers of SFG threatened anew the Icelandic Entities that if they did not advance additional emergency funds to DOC Milwaukee for the Project, SFG would "wipe out their interests in the Project." (*Id*. at ¶ 128.) The Icelandic Entities were forced to assent to advancing emergency funds out of fear of losing their over $17 million investment in the Project. (*Id.*) SFG's threats did not constitute good faith action, and SFG made the threats even though the Icelandic Entities are neither parties to, nor guaranteed the SFG loan agreement. (*Id*. at ¶ 129.) However, SFG was aware that the Icelandic Entities were funding the borrower equity contribution under the SFG loan agreement and providing additional monies for the Project through loans and mezzanine financing, among other ways. As a result, SFG owed the Icelandic Entities an obligation to construe the provisions of the SFG loan agreement, including § 3.25, in good faith. (*Id*.)

SFG also promised that if the Icelandic Entities advanced additional emergency funds, SFG would fund the remaining principal balance of the SFG loan agreement. (*Id*. at

-13-

¶ 130.) It is believed that SFG's fully funding the loan, along with the funding from the Icelandic Entities, would have been sufficient to complete construction at the Project. (*Id.*)

To avoid acceleration and foreclosure, and to obtain the remaining loan proceeds, SFG again required DOC Milwaukee to enter into a forbearance agreement. (*Id.* at ¶ 131.) The Icelandic Entities advanced emergency cash to facilitate the forbearance agreement even though the demand was not made in good faith. (*Id.*) Based upon information and belief, SFG was aware of issues with Silverton's viability that would eliminate its ability to use federal foreclosure laws if the OCC appointed a receiver to administer Silverton's and SFG's assets. (*Id.* at ¶ 132.)

DOC Milwaukee entered into a second forbearance agreement with SFG on or about April 3, 2009 (the "second forbearance agreement"). (*Id.* at ¶ 133.) The guarantors, Hugh, J. Economou, and S. Economou also signed the second forbearance agreement. (*Id*). As with the first forbearance agreement, the Icelandic Entities were not parties to the second forbearance agreement. (*Id.*) The loan commitment, the SFG loan agreement, and the first and second forbearance agreements are collectively referred to as the "loan documents." (*Id.*)

Based on information and belief, DOC Milwaukee entered into the second forbearance agreement because, at that time, acceleration and foreclosure would have wiped out millions of dollars of DOC Milwaukee's and its investors' equity, and would have permanently stopped work on the Project. (*Id.* at ¶ 135.) During such process, SFG engaged

-14-

in additional abusive lending practices, and it repeatedly threatened to sell the SFG loan agreement, including a specific threat to "sell the loan to a loan shark," if the Icelandic Entities did not take immediate steps to complete the Project using their own funds. (*Id.*) The Icelandic Entities were forced to assent to SFG's abusive lending practices because they were fearful of losing their entire investment. (*Id.*)

On May 1, 2009, Silverton was closed by the OCC. (*Id.* at ¶ 136.) Subsequently, it was placed into a receivership, and the FDIC was appointed as the receiver. (*Id.*) On the date Silverton was closed, an entity known as Silverton Bridge Bank was chartered by the OCC to take over operations as a new national bank and controlled by the FDIC in accordance with 28 U.S.C. § 1821(n). (*Id.*) As a result, Silverton ceased legal existence on May 1, 2009. (*Id.*)

A bridge bank allows a failed bank to be liquidated in an orderly fashion, and its duration is limited to the time reasonably necessary to complete the liquidation process. (*Id.*) Silverton Bridge Bank was expressly chartered to accomplish these purposes. (*Id.* at ¶ 137.) Silverton Bridge Bank was empowered by the FDIC, as the receiver, to administer Silverton's assets, including its wholly owned subsidiary, SFG. (*Id.*)

A receiver was appointed by the Comptroller of the Currency to administer the assets of Silverton, including SFG. (*Id.* at ¶ 138.) Even though the Icelandic Entities are not parties to, or a guarantor of the loan documents, they made loans, cash advances, and payments on the loan documents to keep work progressing at the Project, and to avoid having

-15-

their interests destroyed by SFG's threatened foreclosure. (*Id.* at ¶ 139.) Despite the Icelandic Entities' advancing additional funds by the Icelandic Entities, SFG failed to advance the remaining principal balance due under the loan documents. (*Id.* at ¶ 140.) Because of SFG's breach of its promises to fund, a number of unpaid subcontractors have filed liens against the Project, with the total liens in excess of $4,500,000.00. (*Id.*)

On June 5, 2009, the FDIC announced that the Silverton receivership would be discontinued on June 29, 2009, due to the receiver's inability to sell Silverton's loan portfolios. (*Id.* at ¶ 141.) The Icelandic Entities continued to advance funds to SFG to keep payments on the loan documents current through June 30, 2009. (*Id.* at ¶ 142.) The Icelandic Entities were the only parties who were willing or able to advance funds for the Project at that time. (*Id.*)

Although the Icelandic Entities advanced funds to keep the loan current, SFG declared the SFG loan agreement in default for a third time and advised on June 16, 2009, that it would not accept any further curative payments after June 30, 2009. (*Id.* at ¶ 143.) SFG advised that it intended to foreclose and "wipe out" the Icelandic Entities' interests, as well as the interests of all subcontractors. (*Id.*)

In June 2009, after the FDIC stepped in, Fasteignir and Askar contacted SFG regarding arrangements to continue to service the mortgage and were informed that SFG would no longer accept payments from any of the Icelandic Entities to keep the loan current. (*Id.* at ¶ 144.)

-16-

On June 22, 2009, BuyCo petitioned for DOC Milwaukee to be placed into a receivership, and Seth E. Dizard was appointed as receiver. (*Id.* at ¶ 145.) *See SJ Properties Suites, BuyCo, ehf, v. DOC Milwaukee County L.P., Milwaukee County Circuit Court*, No. 2009CV009785, available at http://wcca.wicourts.gov (last visited Aug. 23, 2010). BuyCo petitioned for a receiver to address partnership impasse issues with EP Milwaukee, LLC, including a dispute over who had the right to be the general partner. (*Id.*) BuyCo also petitioned for the receivership because SFG would no longer accept payments from any of the Icelandic Entities, or other mezzanine lenders. (*Id.*) Dizard has the responsibility of seizing and preserving all of DOC Milwaukee's property, including the Project, for the benefit of DOC Milwaukee's creditors.

On February 5, 2010, the FDIC announced that it was placing a number of Silverton's assets, including SFG's loans and participations, for forced auction. (*Id.* at ¶ 146.) The FDIC retained Deutsche Bank, N.A. to auction off a total loan portfolio valued at $400,000,000.00. (*Id.*) The portfolio consisted of 62 whole loans – including $162,402,456.00 in whole loans held by Silverton and $253,962,558.00 in 40 separate loan participations – including SFG's participation in the loan. (*Id.*) The FDIC assumed SFG's participation and sold the SFG participation at auction in April 2010. (*Id.*)

On May 18, 2010, SFG assigned its interest in the Project to the FDIC. (*Id.* at ¶ 147.) The same day, the FDIC, which had been administering assets through its receiver, assigned that interest to 2010-1 SFG Venture LLC ("Venture") (*Id.* at ¶ 148.) On June 17,

2010, SFG asked the Court to substitute in 2010-1 SFG Venture LLC as the defendant in this action. (*Id*. at ¶ 149.) The Court denied SFG's request. (*Id*. (citing ECF No. 41.).)

### FDIC Defenses

#### *SFG's Standing to Assert the FDIC Defenses*

SFG maintains that the Icelandic Entities' causes of action for unjust enrichment (Count I), promissory estoppel (Count II), and their cause of action under Chapter 224 of the Wisconsin Statutes (Count III), except for the portions of the count brought under Wis. Stat. §§224.77(1)(l) and (k), are barred by 12 U.S.C. § 1283(e)[5] and the

---

[5]As amended effective July 21, 2011, 12 U.S.C. § 1823(e) provides:

(1) In general

No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement--

(A) is in writing,

(B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D) has been, continuously, from the time of its execution, an official record of the depository institution.

(2) Exemptions from contemporaneous execution requirement

An agreement to provide for the lawful collateralization of –

(A) deposits of, or other credit extension by, a Federal, State, or local governmental entity, or of any depositor referred to in section 1821(a)(2) of this title, including an agreement to provide collateral in lieu of a surety bond;

(B) bankruptcy estate funds pursuant to section 345(b)(2) of Title 11;

(C) extensions of credit, including any overdraft, from a Federal reserve bank or Federal home loan
(continued...)

*D'Oench* doctrine[6] (the "FDIC defenses").[7] (Def.'s Br. Mot. Dismiss Am. Compl. ("Def.'s

Br. Mot. Dismiss") (ECF No. 48) 23, 25.) (*See also* Def.'s Br. Mot. Dismiss Compl. (ECF

No. 4) 21-30.)[8] In response, the Icelandic Entities assert that SFG cannot present the FDIC

defenses because it failed to identify the FDIC's interest, there is no diminution of any

interest in the loan documents, and SFG has no right to assert the defenses. (Pls.' Resp. Br.

Opp'n Mot. Dismiss Am. Compl. ("Pls.' Opp'n Mot. Dismiss") (ECF No. 53) 8-11.)

  The FDIC defenses work to void any agreement with a bank under the control

of, or in the receivership of the FDIC, if that agreement may diminish any asset of the

corporation, unless it meets several conditions. *See* 12 U.S.C. § 1823(e). Among these

---

[5](...continued)
bank; or

(D) one or more qualified financial contracts, as defined in section 1821(e)(8)(D) of this title, shall not
be deemed invalid pursuant to paragraph (1)(B) solely because such agreement was not executed
contemporaneously with the acquisition of the collateral or because of pledges, delivery, or substitution
of the collateral made in accordance with such agreement.

[6] The doctrine takes its name from *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 460 (1942), wherein the
Supreme Court held that a secret agreement as to a note's enforceability could not be a defense because it would deceive
the banking authorities.

[7]*John v. Resolution Trust Corp.*, 39 F.3d 773, 776 (7th Cir. 1994) observed "the common law *D'Oench* doctrine
and its statutory counterparts are frequently analyzed together and likely serve identical aims (Justice Scalia relied on
*D'Oench* in his analysis of the scope of § 1823(e) in *Langley v. FDIC*, 484 U.S. 862 [1987]." The court stated that

[t]he two, however, may not be co-extensive. The common law doctrine, because it is 'based on the
concept of equitable estoppel,' is narrower than § 1823(e) which 'makes the fault of the party asserting
the unwritten agreement irrelevant.' *Du Pont v. FDIC*, 32 F.3d 592, 597 (D.C. Cir. 1994).

*John*, 39 F.3d at 776.

[8]SFG states that it incorporates, by reference, into its brief in support of its motion to dismiss the amended
complaint both its original brief in support of its motion to dismiss (30 pages) and its reply brief in support of that motion
(16 pages). (Def.'s Br. Mot. Dismiss 9.) However, SFG's briefs in support of its motion to dismiss the amended
complaint and in reply are, respectively, 25 pages and 16 pages long. SFG's total briefs would far exceed the page limits
on briefs set forth in Civil Local Rule 7 (E.D. Wis.) and, thus, wholesale incorporation will not be allowed.

-19-

conditions are that the agreement must be in writing, must be signed at the time of the acquisition of the asset by the FDIC, and must be a part of the record of the bank. 12 U.S.C. § 1823(e)(1)(A), (B), & (D).

Before determining if the FDIC defenses bar the Icelandic Entities' claims, the Court must determine whether SFG may assert those defenses. The Icelandic Entities contend that SFG has no independent right to assert these defenses where the FDIC has not intervened or asserted an interest in the case. (Pls.' Opp'n Mot. Dismiss 11.) They further state that, although the defenses can apply to subsidiaries of national banks, the subsidiary cannot assert the defenses without the involvement of the FDIC with respect to an asset in which it has an interest, and the FDIC has to be the real party in interest for the FDIC defenses to be asserted. (*Id.*)

SFG relies on *Hall v. Federal Deposit Insurance Corp.*, 920 F.2d 334, 339 (6th Cir. 1990), indicating that there are instances when the FDIC may no longer have an interest in an asset but the *D'Oench* doctrine applies. The Icelandic Entities counter that *Hall* presented a much different situation.

*Hall* addressed whether the Federal Savings and Loan Insurance Corporation ("FSLIC")[9] could invoke the *D'Oench* doctrine as a complete bar to the plaintiff borrowers'

_____

[9]The court noted that the defendant in the case was the FDIC, Manager of the FSLIC Resolution Fund, which was substituted for FSLIC by the court's December 4, 1989, order. *Hall*, 920 F.2d at 335 n.2. The substitution was a result of Congress's decision to abolish FSLIC in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *Id.* However, the court stated that because the FSLIC was the original party involved in the case, it would refer to the defendant as the FSLIC. *Id.*

-20-

suit for breach of an loan agreement by a failed savings and loan association. SFG quotes the following statement with the significant deletion of the italicized sentences:

> The effect of an imposition on public funds is the same in the case where a lawsuit creates a negative asset as where it reduces the value of a positive asset. *The D'Oench doctrine should protect FDIC in both cases. D'Oench is important for allowing banking authorities to determine exactly what a bank's assets and liabilities are.* The doctrine may therefore be invoked even where FDIC does not have 'an interest in an asset.

(Def's Reply Br. Mot. Dismiss Compl. (ECF No. 49) 15 (quoting *Hall,* 920 F.2d at 339).) (Emphasis added.)

*Hall* was a lawsuit commenced against Commerce Federal Savings and Loan Association, Inc. ("Commerce") for breach of a loan agreement based on its alleged failure to fully fund a loan. 920 F.2d at 335. Four days before trial, the FSLIC, was appointed as the receiver for Commerce, and became the defendant in the lawsuit. *Id.* Thereafter, a successor savings and loan acquired from the FSLIC the assets and liabilities of Commerce, with the exception of the liabilities arising from the lawsuit, which were assigned to the FSLIC.

The successor savings and loan was added to the lawsuit. *Id.* at 336. However, it prevailed on a motion to dismiss and, on summary judgment the FSLIC was dismissed from the action under the *D'Oench* doctrine. *See id.* at 335 n.2, 336. The appellate court did not reinstate the successor savings and loan as a defendant because it found that the assignment was proper and that the FSLIC was the real party in interest. *Id.* at 337. The

-21-

court expressly stated that it did not need to address the issue of whether the savings and loan as a successor in interest to the FSLIC was protected by the *D'Oench* doctrine. *Id*. at 337 n.6.

However, in *Victor Hotel Corp. v. FCA Mortgage Corp.*, the Court of Appeals for Eleventh Circuit held that the FDIC defenses barred claims against a wholly-owned subsidiary of a failed institution. 928 F.2d 1077, 1083 (11th Cir. 1991). The appeals court held the defenses were applicable even though the FSLIC "was not a party to th[e] action and the defenses asserted would not diminish any present or past right, title, or interest of [the] FSLIC in [the defendant's] loan agreement" with the plaintiff. *Id*; *see also, People ex rel Hartigan v. Commonwealth Mortg. Corp. of Am.*, 723 F. Supp. 1258, 1261 (N.D. Ill. 1989). *Robinowitz v. Gibraltar Sav.*, 23 F.3d 951, 956 (5th Cir. 1994); *Sweeney v. Resolution Trust Corp.*, 16 F.3d 1, 4 (1st Cir.1994); *Oliver v. Resolution Trust Corp.*, 955 F.2d 583, 585-86 (8th Cir.1992). The Court of Appeals for the Seventh Circuit has apparently not addressed the subject. However, based on the foregoing authorities, the Court concludes that the FDIC does not need to involve itself in this lawsuit in order for SFG to raise the FDIC defenses.

The Icelandic Entities also contend that the FDIC defenses are inapplicable because SFG failed to identify the FDIC's interest that is implicated by the claims. (Pls.' Opp'n Mot. Dismiss 8-10.) They further state that the only evidence of a potential interest is the transfer of the loan documents to Venture through the FDIC, and that it is not clear what interests were transferred. (*Id*. at 8-9.) Furthermore, the Icelandic Entities note that

-22-

their claims in this action are not dependent on the loan documents which they indicate the Court recognized in a prior ruling in this case. (*Id.* at 9 (citing the Court's August 25, 2010, Decision and Order, 30 (ECF No. 41.).)

SFG argues that the FDIC has an interest in the case, as recognized by the allegation in the amended complaint. (Def.'s Reply Br. Mot. Dismiss Am. Compl. (Def.'s Reply Dismiss) 2 (citing Compl. ¶ 138).) (ECF No. 56.) It further asserts that SFG remained under FDIC control and was not transferred to Silverton Bridge Bank. (*Id.* (citing Purchase and Assumption Agreement Among Fed. Deposit Ins. Corp. and Silverton Bridge Bank, N.A., Schedule 3.1(i), May 1, 2009, *available at* http://www.fdic.gov/bank/individual/failed/silverton_P_and_A.pdf).) SFG also argues that, even if it had been transferred, the FDIC defenses would still apply. (*Id.* at 3 (citing *FDIC v. Greenberg*, 851 F. Supp. 15, 21 (D. Mass. 1994).)

In *Greenberg*, the district court held that the *D'Oench* doctrine applied to agreements made either before or after the bank is rendered insolvent and that the FDIC, as the receiver for the bridge bank,[10] retained all rights, powers and privileges of the bridge bank when that bank was dissolved. *Greenberg*, 851 F. Supp. at 21. *Greenberg* does not hold that FDIC defenses are available for a bridge bank. Instead, *Greenberg* focuses on the timing of

_____

[10]"Bridge bank" was a term used in 12 U.S.C. § 1821(n)(1)(A), prior to its amendment in 2008. Those entities now referred to as "bridge depository institutions" and may be created "[w]hen 1 or more insured depository institutions are in default, or when the [FDIC] anticipates that 1 or more insured depository institutions may become in default, the [FDIC] may, in its discretion, organize, and the Office of the Comptroller of the Currency, with respect to 1 or more insured banks or 1 or more insured savings associations, shall charter, 1 or more national banks or Federal savings associations, as appropriate, with respect thereto with the powers and attributes of national banking associations or Federal savings associations, as applicable, subject to the provisions of this subsection . . . ." 12 U.S.C. § 1821(n)(1)(A).

-23-

an agreement and the applicability of the defenses to the FDIC based on that timing. *See id.*

SFG further relies on *Hall* to support its position that the FDIC does not need to have a current asset interest to assert the FDIC defenses. (Def.'s Reply Dismiss 3.) The Icelandic Entities argue that *Hall* is inapplicable because the facts are different, and because there has been no clarification as to whether the FDIC has an interest in this case. (Pls.' Opp'n Dismiss 9.)

*Hall* stated, *in dicta*, that where the FDIC no longer has an interest in an asset, the logic of *D'Oench* may still apply to protect the FDIC. *Hall*, 920 F.2d at 339. The court provided examples of where the defenses are applicable, and stated that "[t]he doctrine may therefore be invoked even where FDIC does not have 'an interest in an asset.'" *Id.*

The Icelandic Entities argue that, even if there does not need to be a specific asset, the claims can still be enforced against SFG, just not against the FDIC, relying on *FDIC v. State Bank of Virden*, 893 F.2d 139, 143 (7th Cir. 1990). (Pls.' Opp'n Mot. Dismiss 9-10.) They also argue that the FDIC defenses are only applicable to assets over which the FDIC has an interest, not other assets. (*Id.* at 10 (citing *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1107-08 (11th Cir. 1990).)

*Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1106-07 (11th Cir. 1990), notes that courts have applied the *D'Oench* doctrine to protect entities from claims that were clearly contemplated in the purchase agreement. However, the court declined to extend the

-24-

*D'Oench* doctrine to all claims that would diminish the assets of a federal insurer or its successor. *Vernon*, 907 F.2d at 1108.

Indent *Vernon* is not completely applicable to the situation presented by this case. *Vernon* declined to extend the *D'Oench* doctrine to tortious claims and dealt with stockholders, rather than borrowers. *Vernon*, 907 F.2d at 1107-08. The claims in the instant case are quasi-contractual and do not arise in tort law. (*See infra* at 31-36.)

Indent Most importantly, *Vernon* was significantly narrowed by the Eleventh Circuit Court of Appeals. In *OPS Shopping Center, Inc. v. Federal Deposit Insurance Corporation*, 992 F.2d 306, 307-08 (11th Cir. 1993), a bank issued a letter of credit in violation of a cease and desist order issued by the FDIC, in violation of bank policy, without board approval, and without making any record of its issuance. After the bank was declared insolvent and the FDIC was appointed as its receiver, OPS brought an action against the FDIC based on the letter of credit. *Id*. at 308. The FDIC moved for summary judgment invoking the FDIC defenses. *Id*. The motion was granted.

Indent OPS appealed contending that its claim was not barred by the FDIC defenses because the secret agreement related to a liability of the bank, rather than to a specific asset of the bank that the FDIC had acquired. *Id*. at 309. Responding to that argument, the court clarified that *Vernon* means only that a free-standing tort claim, not related to an asset acquired by the FDIC, is not subject to the FDIC defenses. *Id*. at 310. The court held that in contrast to the tort claims of *Vernon*, the claims in OPS related directly to ordinary

-25-

banking transactions – the rights and obligations relating to the issuance of a letter of credit by the bank – which should be reflected in the records of regular banking transactions. *Id.* at 310-11. The *OPS Shopping Center* court also noted that, as of that date, every court of appeals that had addressed the argument that a claim must be related to a specific asset for *D'Oench* to apply, had rejected the argument. *Id.* at 309-10 (collecting decisions of the Court of Appeals for the First, Fifth, Sixth, and Eighth Circuits).

The Icelandic Entities also maintain that the FDIC defenses do not bar claims against SFG's general assets in which the FDIC has no interest. (Pls.' Opp'n. Mot. Dismiss 10.) They rely on *Vernon*, citing the language discussed above, and *First Financial Savings Bank, Inc. v. Bankers Insurance Co. of Florida, Inc.*, 783 F. Supp. 963, 967 (E.D.N.C. 1991). Although *First Financial* agreed with *Vernon* about the extent of protection provided by the FDIC defenses, *First Financial* presented a different factual context that is not applicable here. *First Financial* also predated *OPS* – which emphasized the free-standing tort at issue in *Vernon*, rather than the specific asset language of *Vernon*.

SFG argues that the Icelandic Entities are merely rearguing the specific asset rule, and points to decisions of several federal appellate circuits that have rejected that contention. (Def.'s Reply Dismiss 4 (citing *Bufman Org. v. FDIC*, 82 F.3d 1020, 1025 (11th Cir. 1996)). In *Bufman*, the Court of Appeals for the Eleventh Circuit acknowledged that, subsequent to *Vernon*, the decisions of that circuit made it clear that not all tort claims escape

-26-

the FDIC defenses and the key is whether the claim is unrelated to a regular banking transaction.   82 F.3d 1020, 1025 (11th Cir. 1996).

In addition, the Icelandic Entities argue that SFG cannot foreclose using federal foreclosure procedures and still assert the FDIC defenses.  The federal foreclosure action, the 315 action, was dismissed by this Court on December 22, 2010, based on the doctrine of prior exclusive jurisdiction.  Because SFG cannot use the federal foreclosure procedures, the argument is moot and will not be addressed.

As the above discussion indicates, the FDIC defenses are available to SFG, a subsidiary of the Silverton Bank, because of the FDIC receivership.  The Icelandic Entities' claims for unjust enrichment and promissory estoppel are based on oral agreements that were not in the record reviewed by the FDIC.  However, SFG has not established that the statutory cause of action under Chapter 224 of the Wisconsin Statutes falls within the ambit of the FDIC defenses.  Therefore, SFG's motion to dismiss based on the FDIC defenses is granted as to the unjust enrichment and promissory estoppel claims and denied as to the Chapter 224 claim.

### Failure to State a Cause of Action

SFG also asserts all seven counts of the Complaint fail to state a cause of action.  Despite concluding that the FDIC defenses bar the promissory estoppel and unjust enrichment counts, the Court will consider SFG's contentions as to each of the challenged counts.

-27-

In considering whether the common law counts state a cause of action, this Court first considers what state's law governs the counts. This case is a diversity case. The Court must determine which jurisdiction's laws apply and, then, follow the conflicts of laws rules of this state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941). SFG maintains that the Icelandic Entities' claims are governed by Georgia law because the loan documents include provisions requiring that they be enforced under Georgia law. (Def.'s Br. Mot. Dismiss Compl. 9.) (ECF No. 4). Wisconsin law holds that it is appropriate to enforce a contractual choice of law provision unless it is contrary to public policy. *See Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 407 N.W.2d 883, 886 (Wis. 1987).

The Icelandic Entities argue that Wisconsin choice of law principles are irrelevant for two reasons. First, they contend that because they are not parties to the loan agreements, the choice of law provision has no effect on their claims. Second, the Icelandic Entities maintain, even if the choice of law provision binds any contractual claims brought by them, their claims are not based in contract. (Pls.' Surreply Opp'n Mot. Dismiss Am. Compl. (Pls.' Surreply Opp'n Dismiss) 3-5.) (ECF No. 55.)

With respect to the Icelandic Entities' argument that the choice of law provision cannot apply because they were not parties to the agreement, the court of appeals for this circuit has held that "to bind a non-party to a forum selection clause, the party must be "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."

*Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993). The courts of appeal for other circuits have reached similar conclusions. *See e.g.*, *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998). At least one district court has applied such reasoning to a choice of law clause. *See Cole v. Am. Cmty, Servs., Inc.*, No. 04-cv-738, 2006 WL 2987815, at *3 (S.D. Ohio Oct. 17, 2006).

The Court of Appeals for the Seventh Circuit also stated that "while it may be true that third-party beneficiaries to a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, a third-party beneficiary status is not required." *Hugel*, 999 F.2d at 209 n.7. Although *Hugel* is based, in part, on the fact that the third-party owned 99% of a company that owned 100% of another, and here it is unclear what percentage of DOC Milwaukee – the borrower – the Icelandic Entities owned, it was foreseeable that the contract between SFG and DOC Milwaukee would effect the Icelandic Entities.

The Icelandic Entities also point to § 779.135(2) of the Wisconsin Statutes, which voids provisions in contracts for improvements of land in Wisconsin that make the contract subject to another state's laws. Wis. Stat. § 779.135(2) (2007-08). However, that section is part of Chapter 779, is entitled "Liens," and further part of Subchapter 1, which is captioned "Construction Liens." *Id.* The Icelandic Entities have not cited any authority holding that Wis. Stat. § 779.135(2) is applicable to a construction loan, nor has any been

-29-

disclosed by this Court's research. Therefore, this Court concludes that Georgia law applies to the contracts.

The Icelandic Entities maintain that, even if they are bound to the contractual choice of law for contract claims, their claims are outside of contracts and therefore the choice of law provision is irrelevant. (Pls.' Surreply Opp'n Mot. Dismiss Am. Compl. 4-5.) They assert that their claims of promissory estoppel and unjust enrichment are tort, rather than contract, claims.

Contractual choice of law provisions do not control tort claims unless it is clear the parties intended them to do so. *See Kuehn v. Children's Hosp.*, 119 F.3d 1296, 1302 (7th Cir. 1997). The Icelandic Entities argue that the loan documents between DOC Milwaukee and SFG do not show a clear intent to require tort claims to be adjudicated in Georgia. (Pls' Surreply Opp'n Dismiss 5.)

The elements of the equitable doctrine of promissory estoppel are that the defendant made a promise upon which he should have reasonably expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff surrendered or rendered a valuable right. *Pabian Outdoor–Aiken, Inc.*, 253 Ga. App. 729, 560 S.E.2d 280, 282 (Ga. Ct. App. 2002). Unjust enrichment applies when there is no legal contract, but when the party has been conferred a benefit by the party contending unjust enrichment, which the benefitted party equitably ought

-30-

to return or compensate for.  *Tuvim v. United Jewish Communities, Inc.*, 285 Ga. 632, 680 S.E.2d 827, 829-30 (Ga. 2009).

The Court declines to further analyze this line of argument, because unjust enrichment and promissory estoppel are quasi-contractual claims and as such are more like contract, than tort, claims.  *See e.g., Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) (indicating that under Wisconsin law, unjust enrichment is a quasi-contractual claim); *ATA Airlines, Inc. v. Fed. Exp. Corp.*, 665 F.3d 882, 884 (7th Cir. 2011)(promissory estoppel is not a tort claim).

### Unjust Enrichment-Count I

SFG contends that the Icelandic Entities do not have standing to bring an unjust enrichment claim because it is based on the loan documents at issue.  The Icelandic Entities allege that SFG was unjustly enriched by them forwarding a total of  $17,419,807.75 toward the Project so that SFG would fund the remaining amount of the loan, although the Project had more than the required equity cushion specified by the loan documents.  (Compl. ¶¶ 152-55.)  Even after these amounts were forwarded, SFG refused to fund the rest of the loan.  (*Id*. at ¶¶ 157-96.)  The Icelandic Entities assert that it would be inequitable to allow SFG to retain the benefit of the provision of these emergency monies when it has not contributed as much as other investors, including the Icelandic Entities, and SFG has taken advantage of all of those monies while failing to fulfill its own funding obligations.  (*Id*. at ¶ 157.)

-31-

The Icelandic Entities were not parties to the agreements that make up the loan documents, nor do they claim to be.  When addressing a question of state law while sitting in diversity, the Court's task is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *Thomas v. H & R Block E. Enters*., 630 F.3d 659, 663 (7th Cir. 2011).  If the state's highest court has yet to rule on an issue, "decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Id.*  (quoting *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 925 (7th Cir. 2002)).

The Supreme Court of Georgia held that "[u]njust enrichment applies when as a matter of fact there is no legal contract . . . , but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for."  *Engram v. Engram*, 265 Ga. 804, 463 S.E.2d 12, 15 (Ga. 1995)(citation omitted.).  *See also Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1010 (7th Cir. 2000)(stating that under Georgia law, "[t]he theory of unjust enrichment applies when as a matter of fact there is no legal contract." (quoting *Brown v. Cooper*, 237 Ga. App. 348, 514 S.E.2d 857, 860 (Ga. Ct. App. 1999) and citing *Stowers v. Hall*, 159 Ga. App. 501, 283 S.E.2d 714, 716 (Ga. Ct. App. 1981)).  Therefore, SFG's standing argument lacks merit.

-32-

SFG also contends that, because there was a contract, the unjust enrichment claim must fail. (Def.'s Br. Mot. Dismiss 12-13.) This contention is based on the Icelandic Entities' reliance on the loan documents in their Complaint. *See id.*) However, the Icelandic Entities clearly allege that they were *not* parties to the loan agreements. SFG's contention lacks factual and legal support.

In order to state a claim of unjust enrichment, a plaintiff must allege that it conferred a benefit to the defendant for which it should be equitably compensated. *See Engram*, 463 S.E.2d at 15; *See also, City of Atlanta v. Hotels.com, et al.*, 289 Ga. 323, 710 S.E.2d 766, 771 (Ga. 2011). According to Complaint, SFG would inequitably benefit from the monies that were advanced by the Icelandic Entities. Specifically, the Icelandic Entities maintain that they are unsecured creditors of DOC Milwaukee. However, to protect the physical state of the Project they made emergency payments for site security and insurance, and procured engineering assessments. (Compl. ¶¶ 163-79.) Further, SFG was aware of these advances, but has done nothing to protect the Project, and instead is letting the Project deteriorate and diminish in value. (*Id.* at ¶¶ 178-79.) The monies advanced are maximizing the value of the Project, which is collateral for the SFG loan, so SFG is retaining the benefit of the money spent by the Icelandic Entities without compensating the Icelandic Entities. (*Id.* at ¶¶ 179-81.) SFG was aware that the Icelandic Entities were providing funds to protect the Project and prevent waste, but took no measures to stop the Icelandic Entities'

-33-

expenditure of those funds. SFG has been unjustly enriched by the funds that the Icelandic Entities have advanced to protect the Project. (*Id*. at ¶¶ 178-79.)

Both parties rely on cases that are inapplicable, either because they are based on non-Georgian law, or they are factually distinguishable. Regardless, in this case, the Icelandic Entities' Complaint alleges sufficient facts to state a plausible cause of action for unjust enrichment. The Complaint alleges the Icelandic Entities' maximized the value of the Project, which has conferred a benefit upon SFG. The Complaint sufficiently details that the Icelandic Entities advanced $17,419,807.75 for the Project and made emergency payments for site security and insurance, as well as procuring engineering assessments. While not all of the Icelandic Entities' contributions are quantified, the facts alleged and the reasonable inferences from those facts sufficiently indicate that the contributions of the Icelandic Entities protected and maximized the value of the Project. Since the Project collateralizes the SFG loan agreement, the Icelandic Entities' advancement of monies and other contributions conferred a benefit upon SFG. The Icelandic Entities' claim has facial plausibility because they have plead factual content that allows the Court to draw the reasonable inference that SFG has been unjustly enriched. *See Iqbal*, 129 S.Ct. at 1949. Therefore, if the FDIC defenses were not applicable, the unjust enrichment claim would state a cause of action.

-34-

SFG also maintains that the Icelandic Entities' promissory estoppel count fails to state a cause of action. The state of Georgia has long recognized the doctrine of promissory estoppel. *See Gen. Commc'ns Serv. v. Ga. Pub. Serv. Comm'n*, 244 Ga. 855, 262 S.E.2d 96, 96 (Ga. 1979). The doctrine is codified in a statute, which states "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Ga. Code Ann. § 13-3-44(a) (1981). The Georgia legislature also intended for promissory estoppel to be a contractual doctrine, as evidenced by its placement in Title 13 of the Official Code of Georgia, which governs contracts. *See id.*

Further, the Icelandic Entities have standing to assert such a claim, because a third party, who may not be in privity of contract, can assert a claim for promissory estoppel if assurances were made to that party and the promises were not fulfilled. *See Irvin v. Lowe's of Gainesville, Inc.*, 165 Ga. App. 828, 302 S.E.2d 734, 736 (Ga. Ct. App. 1983). A garden variety claim of promissory estoppel, differs from a conventional breach of contract claim only in basing the enforceability of the defendant's promise on reliance rather than on consideration. *ATA Airlines, Inc.*, 665 F.3d at 884.

-35-

The Icelandic Entities have sufficiently alleged that SFG made promises to them and they acted in reliance on those promises (Compl. ¶¶ 183-90). The Icelandic Entities relied on SFG's promise that it would advance $20,900,000.00 toward the Project under the SFG loan agreement and loan commitment and the oral promises of SFG's loan officers that SFG would advance additional funds over and above the amount promised in the loan agreement and loan commitment. (*Id.* at ¶¶ 183-84.) In reliance on these promises, the Icelandic Entities advanced $7,286,802.98 toward the Project. (*Id.* at ¶ 185.) Furthermore, in reliance on SFG's promises that it would fully fund the SFG loan agreement and loan commitment, the Icelandic Entities advanced an additional $10,419,807.75 toward the Project. (*Id.* at ¶ 187.) The Icelandic Entities indicate that, if they had known that SFG did not intend to fully fund the SFG loan agreement, they would not have advanced additional funds toward Project. (*Id.* at ¶ 189.) They also allege that they suffered real and proximate harm because of SFG's breach of its promises. (*Id.* at ¶ 190.)

The Icelandic Entities' allegations are more than the labels and conclusions, and mere recitation of the elements of the cause of action proscribed by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Therefore, if not for the FDIC defenses, the motion to dismiss would be denied as to the promissory estoppel claim.

*Violation of Subchapter III of Wisconsin Statutes Chapter 224 -Count III*

_____ In moving to dismiss the Icelandic Entities' claim against it for violating of Chapter 224 of the Wisconsin Statutes which regulates mortgage bankers,[11] SFG argues for dismissal of the claim as a whole. However, SFG also presents arguments for dismissal of components of the claim that are premised on six statutory provisions within Chapter 224.

In Count III, the Icelandic Entities assert that SFG is a mortgage banker, relying in part on the allegation in SFG's Complaint in the 315 action, that it was a mortgage banker. (*Id.* at ¶ 192.) However, in seeking dismissal of the entire claim, SFG states that the Icelandic Entities specifically allege that SFG is not a mortgage broker under Wisconsin law. (Def.'s Br. Mot. Dismiss 14.) SFG contends that, regardless of whether it disagrees with their allegations, the Icelandic Entities' allegations must be taken as true for the purposes of this motion, citing *Clorox Co. v. S. C. Johnson & Son, Inc.*, 627 F. Supp. 2d 954, 968 (E.D. Wis. 2009).

However, SFG has focused on only a portion of the pertinent paragraph in *Clorox*. In fact, *Clorox* states, "[i]n considering a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff." *Id.* (citing *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007)). Therefore, for the purposes of this motion, the Court accepts as true the Icelandic Entities' allegation that SFG asserted itself as Wisconsin

---

[11]Chapter 224 was amended in 2010. However, the Icelandic Entities rely upon the 2007 version of Chapter 224. The 2007 version of the Chapter is included in the file as part of the Appendix of Unreported Decisions and Superseded Statutes filed on October 21, 2010. (ECF No. 50)

mortgage banker even though the Icelandic Entities also pled that they do not believe SFG is a Wisconsin mortgage banker. (*See* Compl. ¶¶ 35-47, 52-54.)

The next issue that SFG presents is whether the FDIC defenses bar the claim under Wisconsin Statutes § 224.71(1). SFG maintains that of the six subsection violations alleged by the Icelandic Entities, all, except the claims under § 224.71(l) and (k), are barred by the FDIC defenses. (Def.'s Br. Mot. Dismiss 23-25.) SFG relies upon the same arguments that this Court has previously addressed. (*See infra* at 19-27.) For the reasons previously stated, those arguments are not persuasive and the § 224.71 claims are not subject to dismissal based on the FDIC defenses.

In order to bring the § 224.71 claims, the Icelandic Entities must have standing. Under Wisconsin Statutes § 224.80(2), a private cause of action may be brought by "[a] person who is aggrieved by an act which is committed by a mortgage banker. . . and is described in s. 224.77(1)." Wis. Stat. § 224.80(2) (2007-08). The remedies available are twice the origination costs, between $100 and $2,000 per violation; or "[t]he actual damages . . . sustained because of the violation." *Id.* § 224.80(2)(a)(1)-(2).

SFG contends that the language of § 224.80 makes it clear that only a borrower was intended to have standing. (Def.'s Br. Mot. Dismiss 16.) The Supreme Court of Wisconsin has explained: "The goal of statutory interpretation is to "'faithfully give effect to the laws enacted by the legislature.'" *Warehouse II, LLC v. State Dep't of Transp.*, 291 Wis. 2d, 80, 715 N.W.2d 213, 219 (Wis. 2006) (quoting *State ex rel. Kalal v. Circuit Court*

-38-

*for Dane Cnty.*, 271 Wis.2d 633, 681 N.W.2d 110, 123 (Wis. 2004)). Wisconsin courts defer to the policy choices of the legislature and assume that the legislature's intent is expressed in the statutory language it chose. *See id.* Therefore, "[s]tatutory interpretation begins with the language of the statute." *State v. Jensen*, 324 Wis. 2d 586, 782 N.W.2d 415, 419 (Wis. 2010). If the meaning of the statute is plain, Wisconsin courts look no further. *Id.*

The plain language of the statute, specifically states an action can be brought by "[a] person aggrieved by an act. . . by a mortgage banker." Wis. Stat. § 224.80(2). SFG's contention is contrary to the statutory language which does not limit the remedy to borrowers and is, therefore, rejected. The Wisconsin Supreme Court has stated that "an 'aggrieved party' is defined in part as 'one having an interest . . . which is injuriously affected." *See Liebovich v. Minn. Ins. Co.*, 310 Wis. 2d 751, 751 N.W.2d 764, 774-75 (Wis. 2008) (citation omitted).

SFG argues that, even if the Icelandic Entities have standing, they are not attempting to recover loan origination costs, so they are limited to actual damages which were sustained because of the violation, and the Icelandic Entities have not alleged that they sustained damages because of the violation. (Def.'s Reply Mot. Dismiss 13.) The Icelandic Entities disagree, stating that they are under no obligation to assert specific money damages at the pleading stage and that they have alleged facts to support specific violations of § 224.77. (Pls.' Opp'n Mot. Dismiss 26.)

The Icelandic Entities' allegations are sufficient to put SFG on notice that they were damaged and provide a plausible claim, establishing standing. The Icelandic Entities have alleged that they suffered real and proximate harm because of SFG's violations of § 224.77(1), and specify that they had to pay additional funds, and could lose all of the money they invested in the Project due to the violations. (*See* Compl. ¶¶ 196-97.) This ground for dismissal is denied.

### 1. Section 224.77(1)(b) & (c)

The Icelandic Entities allege that SFG violated § 224.77(1)(b) and (c). (*Id.* at ¶ 197.) SFG argues that these allegations must be dismissed because § 224.77(1)(b) only applies to "parties to a transaction" and (1)(c) applies to "a client," and the Icelandic Entities do not allege they were clients of SFG or parties to a transaction with SFG. (Def.'s Br. Mot. Dismiss 17-18.) The Icelandic Entities counter that SFG is seeking to artificially limit these provisions and that the language in these subsections does not prohibit claims by other parties. (Pls.' Opp'n Mot. Dismiss 27.) However, they do not cite any authority in support of their contention.

The plain language of the sections in question specifically requires the wrongs to be incurred by a party to a transaction, or a client, in (b) and (c), respectively. *See* Wis. Stat. §§ 224.77(1)(b), (c) (2007-08). The Icelandic Entities' allegations regarding these subsections arise from loan agreements to which they were not a party, and the Icelandic Entities do not allege that they were SFG's client. Therefore, the portion of Count III that

-40-

relies upon violations of §§ 224.77(1)(b) and (c) does not state a claim for relief (Compl. ¶ 197) and is dismissed.

### 2. Sections 224.77(1)(l) & 224.72(4)(a)(2)

The Icelandic Entities next allege that SFG violated § 224.77(1)(l) because SFG failed to maintain a surety bond in violation of Wisconsin Statutes § 224.72(4)(a)(2). (*Id.* at ¶ 198.)  In seeking dismissal of this portion of Count III, SFG asserts that these allegations must fail because the provision only applies to applicants for registration as a mortgage banker who maintain a *bona fide* office in Wisconsin.  (Def.'s Br. Mot. Dismiss 18.)  SFG also contends that the surety bond was just one of four options to comply with the statute, and that the Icelandic Entities do not allege that they were aggrieved by SFG's failure to maintain a surety bond.  (*Id.*)

In response, the Icelandic Entities maintain that SFG had apparently not fulfilled any of the four acts required to comply with § 224.72(4)(a)(2).  They also state that, if SFG had maintained a surety bond, they could have possibly recovered some or all of the monies they provided to the Project from that bond.  (Pls.' Opp'n Mot. Dismiss 27.)

The Icelandic Entities' claim does not include any allegation that SFG did not meet *any* of the four conditions under the statute.  It simply alleges that one of four options was not satisfied. Thus, that portion of Count III which relies upon the alleged violation of § 224.74(4)(a)(2) (Compl. ¶ 198) does not state a claim upon which relief may be granted.

-41-

*3. Sections 224.77(1)(k) & 224.72(4)(d)(1), 224.72(5)(b), 224.79(1), 224.79(2)*

Section 224.77(1)(k) states that an application to be a mortgage broker under § 224.72 of the Wisconsin Statutes may be denied, or registration may be revoked, suspended, or limited if the mortgage banker violates any provision of Section 224 Subchapter III, Chapter 138, or any other state or federal statute or regulation related to practice as a mortgage banker. The Icelandic Entities allege that SFG violated this provision by failing to maintain a surety bond in violation of § 224.72(4)(d)(1), not registering or obtaining a certificate of registration from the Wisconsin DFI under § 224.72(5)(b), issuing loan documents that did not comply with disclosure requirements under § 224.79(1), and by not providing a Consumer Disclosure Statement, which is required by § 224.79(2). (Compl. ¶¶ 199(a)-(d).)

*Sections 224.77(1)(k), 224.79(1) & (2)*

SFG seeks dismissal contending that such allegations lack merit. (Def.'s Br. Mot. Dismiss 19.) First, SFG states that §§ 224.79(1) and (2) only apply to a relationship between a consumer and mortgage broker, rather than a mortgage banker. (*Id.*) It further states that in regard to those same statutory provisions, the Icelandic Entities are not consumers. (*Id.* (citing Wis. Stat. § 224.71 (2007-08)).

The Icelandic Entities respond that whether they are consumers is not relevant to whether SFG violated the statutes. (Pls.' Opp'n Mot. Dismiss 27-28.) The Icelandic

-42-

Entities provide no authority for this assertion and it is contrary to the plain language of the statute.

The statute uses the term "consumer" multiple times in both § 224.79(1) and (2). *See* Wis. Stat. § 224.79(1)-(2) (2007-08). Section 224.71(1d) defines "consumer" as "a person other than an organization. . . who seeks or acquires mortgage brokerage services for personal, family, or household purposes." Wis. Stat. § 224.71(1d) (2007-08). Under this definition, the Icelandic Entities are not consumers. Nor, do they allege that any services they received or sought were for personal, family, or household purposes. Therefore, § 224.79(1) and (2) do not apply to the Icelandic Entities. Therefore, Count III may not rely upon alleged violations of § 224.79(1) and (2), and ¶ 199(c) and (d) are dismissed. Because § 224.79(1) and (2) are not applicable to the Icelandic Entities, the Court declines to address SFG's remaining arguments regarding those provisions.

*Sections 224.77(1)(k) & 224.72(4)(d)(1)*

SFG contends that the allegation that it violated § 224.77(1)(k) because it did not maintain a surety bond as required under § 224.72(4)(d)(1), (Compl. ¶ 199(a)), should be dismissed. It maintains that § 224.72(4)(d)(1) only applies to applicants who register as a mortgage banker, and the Icelandic Entities assert that SFG never applied for registration as a mortgage banker in Wisconsin. (Def.'s Br. Mot. Dismiss 19.) Hence, SFG asserts that the provision is inapplicable. SFG also asserts that the Icelandic Entities have not alleged that they were damaged by SFG's failure to comply with this provision. (*Id.*)

-43-

Contrary to SFG's contentions, the Icelandic Entities state that SFG violated § 224.72(4)(d)(1), and therefore, they violated § 224.77(1)(k). (Compl. ¶ 199(a).) The Icelandic Entities state that they were injured by the failure to maintain a surety bond because their interests may be wiped out as a result of SFG's attempts to foreclose on the Project. (*Id.* at ¶ 197.) The Complaint, therefore, contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Iqbal,* 129 S. Ct. at 1949.

*Sections 224.77(1)(k) & 224.72(5)(b)*

In addition, the Icelandic Entities allege that "SFG never obtained a certificate of registration from the Wisconsin [DFI] under. . . section 224.72(5)(b)." (Compl. ¶ 199(b).) SFG states that the provision in question merely instructs the DFI when it may issue a certificate of registration, but imposes no duty or obligation on anyone else. (Def.'s Br. Mot. Dismiss 19.) SFG further asserts that the Icelandic Entities do not allege how they were damaged by this alleged violation. (*Id.*)

The Icelandic Entities respond that, to the extent that SFG never registered, it cannot assert status as a mortgage banker. (Pls.' Opp'n Mot. Dismiss 28.) As previously stated, for the purposes of considering whether Count III states a cause of action, the Court accepts as true the Icelandic Entities' allegations that SFG asserted itself as Wisconsin mortgage banker, even though elsewhere in the Complaint, the Icelandic Entities also have pled that they do not believe SFG is a Wisconsin mortgage banker. *See Clorox Co.*, 627 F. Supp. 2d at 968; (Compl. ¶¶ 35-43, 51-54, 192-94.) Also, it accepts as true, paragraph

-44-

199(b) of the Complaint which states that SFG never registered or obtained a certificate of registration that could have been issued under § 224.72(5)(b), although it acted as a mortgage banker in violation of § 224.72(1m). *See Clorox Co.*, 627 F. Supp. 2d at 968; Wis. Stat. § 224.72(1m) (2007-08). Under *Iqbal*, the Icelandic Entities have alleged facts, which taken as true, are sufficient to support a plausible cause of action. (*See* Compl. ¶¶ 35-43, 51-54, 192-94, 199(b).)

Therefore, SFG has established that the Icelandic Entities cannot state a claim under §§ 224.79(1) and 224.79(2)(2007). However, it has not established that §§ 224.77(1)(k), 224.72(4)(d)(1), and 224.72(5)(b), cannot be relied upon to state the Chapter 224 claim.

### 4. Section 224.77(1)(l) Claim

The Icelandic Entities further allege that SFG violated Wisconsin Statutes § 224.77(1)(l) based on allegations throughout the Complaint that SFG failed to conform with the standard of professional behavior and standard of care for mortgage bankers. (*Id.* at ¶ 200.) SFG argues that the Icelandic Entities failed to identify any standard of professional behavior or standard of care that SFG must follow. (Def.'s Br. Mot. Dismiss 20.) SFG states that the Icelandic Entities rely on the Comptroller's Handbook as establishing an industry standard of care. (*Id.* (citing Compl. ¶ 20).) However, SFG asserts that nothing in the Comptroller's Handbook creates a private right of action, provides that a borrower or its investors would have a private right of action, or indicates that it is intended

-45-

to create a standard of professional behavior or standard of care that a bank owes to a borrower or the general public. (*Id.*)

SFG's contentions are not supported by the Complaint, which are taken as true. The Icelandic Entities allege several different required standards with which SFG failed to comply. (*See* Compl. ¶¶ 20-21, 57-62, 66-67 & 69.) These allegations are included in the § 224.77(1)(l) claim by incorporation. (*Id.* at ¶ 200.)

SFG also contends that the Icelandic Entities failed to allege how SFG had a duty to the Icelandic Entities to comply with the Comptroller's Handbook or how they were injured. (Def.'s Br. Mot. Dismiss 21.) The statute allows for a private cause of action by a person aggrieved when a mortgage banker engages in conduct that violates an established standard of professional care for mortgage bankers. *See* Wis. Stat. §§ 224.77(1)(l) & 224.80 (2). According to the Complaint, there are established standards of professional care for mortgage bankers, SFG violated those standards, and that the Icelandic Entities were injured because of this conduct, (*see* Compl. ¶¶ 57-62, 66-67, 69, 124, 136, 139-40.) Therefore, SFG's motion to dismiss that portion of Count III which relies on Wisconsin Statutes § 224.77(1)(l) is denied.

### 5. *Section 224.77(1)(m) Claim*

The Icelandic Entities allege that SFG violated § 224.77(1)(m) of the Wisconsin Statutes because it engaged in improper conduct and dishonest dealings. (*Id.* at ¶ 201.) SFG contends that the Icelandic Entities have failed to allege any dealings between

-46-

SFG and themselves that could constitute dishonest dealings under the statute, and that to the extent the allegations are based on the same allegations as the promissory estoppel and unjust enrichment claims, the claim must fail because it cannot be based on improper conduct or dishonest dealings upon which reliance is not reasonable. (Def.'s Br. Mot. Dismiss 21.) SFG also asserts that other allegations contradict such allegations because the Icelandic Entities also allege that SFG could not obtain funds to lend. (*Id.* at 22.) SFG further argues that it had the right to foreclose so that its threats to do so were not dishonest, and that it had the right to reject payments when defaults were not cured. (*Id.*)

In opposition, the Icelandic Entities argue that SFG incorrectly asserts that allegations that are the basis for promissory estoppel and unjust enrichment claims cannot also provide the basis for their claim under § 224.77(1)(m). (Pls.' Opp'n Mot. Dismiss 28-29.) They further argue that there is no such limitation in the statute. (*Id.* at 29.) They also assert, regardless of whether SFG views the Complaint as including some evidence of fair dealings, that does not bar their allegation against SFG under the statutory provision. In addition, they maintain that, in making the claim, they are not asserting DOC Milwaukee's rights under the loan documents. (*Id.*)

The Icelandic Entities correctly indicate that there is no limitation in § 224.77(1)(m) with regard to alleging the same acts as they alleged in their promissory estoppel and unjust enrichment claims. The statute simply applies to "conduct, whether of the same or a different character than specified elsewhere in [Wis. Stat. § 224.77], which

-47-

constitutes improper, fraudulent or dishonest dealing." Wis. Stat. § 224.77(1)(m) (2007-08). The Icelandic Entities sufficiently allege that SFG engaged in improper and dishonest dealings throughout the Complaint. *Iqbal*, 129 S. Ct. at 1249; (*See* Compl. ¶¶ 107-43, 191 & 201.)  Therefore, SFG's motion to dismiss the portion of Count III that relies upon § 224.77(1)(m) is denied.

### 6. Section 224.77(1)(o) Claim

The sixth portion of Icelandic Entities claim under Chapter 224 is that SFG treated the Icelandic Entities unequally based on their national origin, in violation of Wisconsin Statutes § 224.77(1)(o).  As relevant to the Icelandic Entities' claim, the subsection prohibits a mortgage banker or broker, in the course of practice as a mortgage banker or mortgage broker, from treating "a person unequally *solely* because of," among other things, national origin.  Wis. Stat. § 224.77(1)(o) (2007-08) (emphasis added).

SFG maintains that the allegations in paragraph 202 of the Complaint are false, but even if they were true, the Icelandic Entities failed to allege that their national origin was the sole basis for SFG's alleged refusal to negotiate with them.  (Def.'s Br. Mot. Dismiss 22.)  It also asserts that the Icelandic Entities allege that they did not participate in the negotiations for, nor were they parties to the loan documents.  (*Id.*)  This, from SFG's standpoint is a justification and reason other than national origin, for its refusal to negotiate or deal with some or all of the Icelandic Entities.  (*Id.* at 22-23.)

-48-

The Icelandic Entities counter that discovery will be required to determine whether their national origin was the sole reason for SFG's alleged improper acts, so that dismissal is not appropriate. (Pls.' Opp'n Mot. Dismiss 29.) The statute requires only that "in the course of practice as a mortgage banker" the bank treats someone unequally based solely on national origin. *See* Wis. Stat. § 224.77(1)(o) (2007-08). There is no requirement that the actual transaction was affected by this unequal treatment.

According to the Complaint, the Icelandic Entities were treated differently because SFG employees subjected them to disparaging verbal comments about their national origin "in connection with their behavior during the lending process," and include examples of such remarks. (Compl. ¶ 202). These remarks, made by SFG officers and employees, were made "in connection with their behavior in the lending process" and were based on the Icelandic Entities' national origin. (*Id.*) Specific facts are alleged regarding this unequal treatment, and accepted as true, are sufficient to "state a claim to relief that is plausible on its face." *See Iqbal,* 129 S. Ct. at 1949. SFG's motion to dismiss the portion of Count III under § 224.77(1)(o) of the Wisconsin Statutes is denied.

### *Unclean Hands Against SFG- Count IV*

The Icelandic Entities also include an unclean hands claim against SFG. (Compl. ¶¶ 203-215.) SFG moves to dismiss this claim contending that unclean hands does not exist as a cause of action, but as an affirmative defense. (Def.'s Br. Mot. Dismiss 23.) The Icelandic Entities maintain that such a claim is appropriate where parties have been

-49-

victims of another lawsuit, such as in the instant situation with respect to the foreclosure and other actions filed by SFG. (Pls.' Opp'n Mot. Dismiss 29-30 (citing *Gutierrez v. Gonzales*, 458 F.3d 688, 693 (7th Cir. 2006).)

       *Gutierrez* addressed an alien's petition for judicial review of an order denying the alien's motion to terminate removal proceedings and ordering his deportation. The alien argued that the government had committed affirmative misconduct when it used the information in his obviously deficient application for adjustment of his status to initiate removal proceedings against him. *Id*. Although government had not raised the doctrine of unclean hands, the appellate court stated that the undisputed fact that the alien was violating that law was at least relevant in its determination of whether the government had committed affirmative misconduct in finding out about the alien. *Id*. That case does not support the Icelandic Entities' assertion that a cause of action exists and no other authority for that proposition is provided.

       The Georgia Supreme Court has explained the doctrine as follow:

> "Unclean hands" is a shorthand reference to OCGA § 23–1–10, which states, "He who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action." *See Dobbs v. Dobbs*, 270 Ga. 887, 888, 515 S.E.2d 384 [Ga. 1999](noting that OCGA § 23–1–10 "embodies both the 'unclean hands' doctrine and the concept that 'one will not be permitted to take advantage of his own wrong.' " (citations omitted)). However, *relief is precluded only if the inequity so infects the cause of action that to entertain it " 'would be violative of conscience.' "* *Pryor v. Pryor*, 263 Ga. 153, 153, 429 S.E.2d 676 ([Ga.]1993).

-50-

*Goodson v. Ford*, No. S11A1740, ___ S.E.2d ____, 2012 WL 685802, at *4 (Ga. Mar. 5, 2012). *See also, S & M Rotogravure Serv., Inc. v. Baer*, 77 Wis. 2d 454, 252 N.W.2d 913, 919 (Wis. 1977) ("before a court may deny a plaintiff relief in equity upon the "clean hands" doctrine, it must clearly appear that the things from which the plaintiff seeks relief are the fruit of its own wrongful or unlawful course of conduct.") Based on the foregoing, SFG's motion to dismiss as to the unclean hands "claim" is granted.

### Claims Under Wisconsin Statutes 840.03, 841.01 & 844.01- Counts V, VI & VII

SFG contends that the Icelandic Entities' claims for declaratory relief in counts V, VI, and VII should be dismissed. It maintains that such claims are barred by the law of the case doctrine. (Def.'s Br. Mot. Dismiss 10-11.) In addition, SFG also maintains that the cited sections do not create substantive rights; rather, they only delineate the Wisconsin procedures for enforcing other rights. (*Id*. at 11.) With respect to Count VI, SFG maintains that Chapter 844 of the Wisconsin Statutes is only available to plaintiffs in possession and the Icelandic Entities are the opposite. (*Id*.) SFG also maintains that given the Icelandic Entities' lack of a security interest or even a written interest, they essentially request an equitable lien, which fails as a matter of law due to lack of a writing. (*Id*. at 12.) Additionally, it asserts that a cognizable claim for unjust enrichment is also a prerequisite for an equitable lien, and that the Icelandic Entities' unjust enrichment claim fails as a matter of law. (*Id*).

-51-

In arguing that counts are barred by the law of the case, SFG relies upon this Court's August 24, 2010, Decision and Order (ECF No. 41), at pages 18 through 20, which dismissed the Icelandic Entities' equitable subordination claims because they impermissibly sought an adjudication of their alleged interest in the "Property." SFG contends that Counts V, VI, and VII are merely another way of claiming "equitable subordination," arguing that because this Court has already ruled on equitable subordination, the law of the case doctrine prevents the Icelandic Entities from proceeding with these claims.

When a rule of law is decided, it should continue throughout the subsequent stages of the case. *United States v. Story*, 137 F.3d 518, 520 (7th Cir. 1998). The Icelandic Entities neither have nor claim to have a security interest of record in the property. The allegations in the Complaint do not request that the Court prioritize the interests, so the law of the case doctrine does not apply. Therefore, SFG's contention does not provide a basis for dismissal of Counts V, VI, and VII.

### *Section 840.03 Claim – Count V*

Under Count V, the Icelandic Entities seek a declaration of their rights under Wisconsin Statutes § 840.03. SFG maintains that the provision does not create substantive rights but merely delineates Wisconsin's court procedures for enforcing other substantive rights. (Def.'s Br. Mot. Dismiss 12.)

In opposing dismissal of Count V, the Icelandic Entities assert that this is an appropriate cause of action, citing a list of cases brought under § 840.03 that have been

-52-

decided by the Wisconsin Supreme Court and the Wisconsin Court of Appeals. (Pls.' Opp'n Mot. Dismiss 14-15.) However, none of those cited decisions hold that there is a cause of action under § 840.03. Even in the cases where a claim was based on § 840.03, the courts made rulings on other grounds. *See e.g.*, *Nicolet v. Vill. of Fox Point*, 177 Wis. 2d 80, 501 N.W.2d 842, 843 (Wis. Ct. App. 1993). The parties have not cited, and the Court's research has not disclosed, any cases where a cause of action brought under § 840.03 was fully adjudicated under that statute.

In order to determine if there is a cause of action under § 840.03, the Court must engage in statutory interpretation, the sole purpose of which is to ascertain the intent of the legislature. *Voss v. Middleton*, 162 Wis. 2d 737, 470 N.W.2d 625, 629 (Wis. 1991) (citing *Marshall-Wis. Co. v. Juneau Square Corp.*, 139 Wis.2d 112, 406 N.W.2d 764, 772 (Wis. 1987)). To that end, under Wisconsin law, statutory interpretation begins with the language of the statute. *State v. Dowdy*, 338 Wis.2d 565, 808 N.W.2d 691, 698 (Wis. 2012). If the meaning is plain, the Court's inquiry ends. *See id.* If the statute does not unambiguously state the intent, the Court will look to sources outside the statute itself. *Marshall-Wis. Co. v. Juneau Square Corp.*, 139 Wis.2d 112, 406 N.W.2d 764, 772 (Wis. 1987). The Court will then consider the history, context, subject matter, scope and object of the statute. *In re Condemnation by Redev. Auth.*, 120 Wis. 2d 402, 355 N.W.2d 240, 244 (Wis. 1984).

-53-

Section 840.03 of the Wisconsin Statutes states:

Any person having an *interest in real property may bring an action relating to that interest*, in which the person may demand the following remedies singly, or in any combination, or in combination with other remedies not listed, unless the use of a remedy is denied in a specified situation:

(a) Declaration of interest.

(b) Extinguishment or foreclosure of interest of another.

(c) Partition of interest.

(d) Enforcement of interest.

(e) Judicial rescission of contract.

(f) Specific performance of contract or covenant.

(g) Judicial sale of property and allocation of proceeds.

(h) Restitution.

(i) Judicial conveyance of interest.

(j) Possession.

(k) Immediate physical possession.

(l) Restraint of another's use of, or activities on, or encroachment upon land in which plaintiff has an interest.

(m) Restraint of another's use of, activities on, or disposition of land in which plaintiff has no interest; but the use, activity or disposition affect plaintiff's interest.

(n) Restraint of interference with rights in, on or to land.

(o) Damages.

-54-

> (2) The indication of the form and kind of judgment in a chapter dealing with a particular remedy shall not limit the availability of any other remedies appropriate to a particular situation.

(Emphasis added.)  The plain language of the statute indicates that a person with an interest in land may bring an action relating to that land.  The intention of the legislature to authorize a cause of action is apparent from the statutory language.

In addition, statutory language is not interpreted in isolation but rather in context, that is, in relation to the language of surrounding or closely-related statutes.  *Dowdy*, 808 N.W.2d at 698.  Wisconsin courts should interpret statutes to give reasonable effect to every word, so as to avoid surplusage or absurd results.  *Id.*  Section 804.05 states that "any action proper under s[ection] 840.03 may be brought in rem or in personam . . . ."  Wis. Stat. § 840.05 (2007-08).  If no action could be brought under § 840.03, then § 840.05 would be meaningless.  Concluding that the Wisconsin legislature would enact a statute without any meaning would lead to an absurd result.  Therefore, this Court concludes that the Wisconsin legislature intended to create a cause of action under § 840.03.

The inquiry does not end with the determination that a cause of action exists under § 840.03, however.  The Court must still address whether the Complaint alleges sufficient facts to withstand SFG's motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Throughout the Complaint, the Icelandic Entities state that they forwarded large sums of money in the form of loans and equity contributions to keep the Project moving and to protect and maintain the property after the Project halted.  (Compl. ¶¶ 118, 124, 128, 219.)

-55-

They also state that if their interests are not declared, the Icelandic Entities will not be able to protect their equity interest. (*Id.* at ¶ 223.) As previously stated, under *Iqbal*, the Complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S. Ct. at 1949. Here, the Icelandic Entities have pleaded sufficient factual matter, including amounts invested in the Project, to state a claim that is plausible on its face. Therefore, the SFG's motion to dismiss with respect to the § 840.03 claim (Count V) is denied.

*Section 841.01 Claim – Count VI*

Under Count VI, the Icelandic Entities seek a declaration of interest in real property under Wisconsin Statute § 841.01. (Compl. ¶¶ 224-28.) SFG contends that this claim should be dismissed, because § 841.01 is a procedural statute that does not give rise to a cause of action. (Def.'s Br. Mot. Dismiss 12.) Although most of the decisions cited by the Icelandic Entities in opposing SFG's contention do not address § 841.01 other than in passing or tangentially, at least one decision they cite is on point. (*See* Pls' Opp'n Mot. Dismiss 17-19.)

In *Erickson Oil Products v. Wisconsin Department of Transportation*, the Wisconsin Court of Appeals, while stating the matter before them was not a dispute that could be resolved under Chapter 841 of the Wisconsin Statutes, recognized that an action could be brought for a declaration of interests in real property under § 841.01. 184 Wis. 2d 36, 516 N.W.2d 755, 758 (Wis. Ct. App. 1994). Additionally, and contrary to SFG's

-56-

assertion, the Wisconsin Court of Appeals found that a plaintiff and defendant were both seeking relief pursuant to § 841.01, although neither had expressly invoked that statute. *Schunk v. Brown*, 156 Wis. 2d 793, 457 N.W.2d 571, 572 (Wis. Ct. App. 1990) (decided on other grounds). In addition, a review of Chapter 841 as a whole shows that the legislature intended for § 841.01 to create a cause of action. *See In re Condemnation by Redev. Auth.*, 355 N.W.2d at 244.

Having determined that there is a cause of action under Wisconsin Statute § 841.01, the Court must now address whether the Complaint sufficiently alleges a claim under that statute. Section 841.02 sets forth information that must be included in a complaint for a declaration of interests. It states, "[t]he complaint shall describe the real property, the interest of the plaintiff and how the plaintiff acquired the interest, the interest of each person claiming an interest known to be adverse to the plaintiff, . . . and demand that the interests of the plaintiff be established against adverse claims." Wis. Stat. § 841.02 (2007-08).

The Icelandic Entities clearly state that they have an equity interest in the property based on the $17,419,807.75 invested through contributions to the Project and loans made to DOC Milwaukee. (Compl. ¶ 124.) The Icelandic Entities also describe SFG's interest throughout the Complaint. (*See e.g.*, *id.* at ¶¶ 84-98.) Other adverse parties are also identified as a group as subcontractor. (*Id.* at ¶¶ 154, 226-27.) Finally, the Icelandic Entities demand that their interest be established against SFG and the subcontractors. (*Id.* at ¶¶ 226-27.) Such allegations satisfy the requirements § 841.02. Additionally, the allegations,

-57-

accepted as true for purposes of this motion, state a plausible claim of relief. *See Iqbal*, 129 S.Ct. at 1249. Therefore, SFG's motion to dismiss Count VI for failure to state a claim is denied.

*Section 844.01 Claim – Count VII*

The Icelandic Entities also allege that SFG interfered with their interest and caused physical injury to the real property, and seek a remedy for this harm under Wisconsin Statutes § 844.01. (Compl. ¶¶ 229-39.) In seeking dismissal of Count VII, SFG argues that § 844.01 does not create a cause of action, primarily relying upon two decisions. (Def.'s Br. Mot. Dismiss 6-9.) The first decision is *Shanak v. City of Waupaca*, 185 Wis. 2d 568, 518 N.W.2d 310, 320 (Wis. Ct. App. 1994), which holds that the history of § 844.01 establishes its remedial nature. The court of appeals noted that it was originally enacted as Wis. Stats. § 810.01, and the source of § 810.10 was 1973 Senate Bill 116. *Id.* The Wisconsin Legislative Reference Bureau's analysis of Senate Bill 116 states that it recodified the law on real property and "set out 'real property remedies obtainable by a lawsuit.'" *Id.* That court further stated that § 844.01 is "remedial and procedural statute" and does not create any rights or duties. *Id.*

Two years later in *Menick v. City of Menasha*, 200 Wis. 2d 737, 547 N.W.2d 778, 782 (Wis. Ct. App. 1996), the Wisconsin Court of Appeals sustained summary judgment against a claim brought under § 844.01. The court reaffirmed its earlier interpretation of the statute, holding that the statute does not create a cause of action. *Id.*

-58-

The Icelandic Entities assert that consideration of *Shanak* and *Menick* is only the first step of analysis in a rather complicated area of law and cite several other cases that involved § 844.01. (Pls.' Opp'n Mot. Dismiss 20-21.) The first case relied upon by the Icelandic Entities is *Schultz v. Trascher*, 249 Wis. 2d 722, 640 N.W.2d 130 (Wis. Ct. App. 2001). In *Schultz*, the Wisconsin Court of Appeals reviewed the cases involving § 844.01 and found that of the three published cases, there was an unsuccessful attempt to base a cause of action on § 844.01. *Id.* at 139. However, in *Schultz*, the trial court used § 844.01 to "fashion an equitable remedy" for a private nuisance. *Id.* Therefore, *Schultz* does not stand for the proposition that § 844.01 creates a cause of action.

The Icelandic Entities also rely on two Wisconsin Supreme Court cases. They rely on *Kruckenberg v. Harvey*, stating the court allowed a § 844.01 claim to proceed, reversing the Wisconsin Court of Appeals. (Pls.' Opp'n Mot. Dismiss 20-21.) Although *Kruckenberg v. Harvey* was an action brought under § 844.01, the Wisconsin Supreme Court reversed the appellate decision based on claim preclusion, and did not address whether § 844.01 gives rise to a cause of action. 279 Wis. 2d 520, 694 N.W.2d 879, 894 (Wis. 2005). The Icelandic Entities also rely on *Liebovich*, 751 N.W.2d at 776 n.9, which they assert states that a claim could have been brought under § 844.01. (Pls.' Opp'n Mot. Dismiss 21.) However, the Wisconsin Supreme Court stated that the plaintiffs did not bring a claim under 844.01, but that the statutory language helped illustrate that the plaintiff's complaint alleged a physical injury to real property. *See Liebovich*, 751 N.W.2d at 776 n.9.

-59-

There is some authority to support the Icelandic Entities' claim that a cause of action exists under § 844.01. A 2009 Wisconsin Court of Appeals decision notes that Chapter 844 "*authorizes* actions for interference with or physical injury to an interest in real property" and cited § 844.01. *Soma v. Zurawski*, 321 Wis. 2d 91, 772 N.W.2d 724, 728 n.4 (Wis. Ct. App. 2009) (emphasis added). The court then discussed remedies that may result from an action under Chapter 844. *Id.* The foregoing may indicate that at least one Wisconsin appellate court believes a cause of action can exist under § 844.01.[12] Additionally, although *Liebovich* did not rule on § 844.01 or expressly state that a cause of action exists, by comparing the claim to the language of § 844.01, it too seems to indicate that a cause of action could exist. *See* 751 N.W.2d at 776 n.9.

This action is brought before the Court under its diversity jurisdiction. In diversity actions where the state's highest court has not ruled on an issue, a federal court must predict how that court would rule on the issue. *See, e.g.*, *River E. Plaza, LLC. v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 721 (7th Cir. 2007). Based on the *dicta* in *Liebovich* and the fact that the appellate decision holding that a cause of action exists under § 844.01 is more recent than those decisions that found no cause of action existed, this Court predicates that the Wisconsin Supreme Court would find a cause of action to exist under

---

[12] In *Hutchens v. Simonson*, the Wisconsin Court of Appeals analyzed whether the plaintiffs had the burden of proof to establish an ownership claim in order to succeed in their cause of action under section 844.01. 276 Wis. 2d 865, 688 N.W.2d 784 (Wis. Ct. App. 2004) (Table). However, the case is unpublished and has no precedential value. *See* Wis. Stat. § 809.23 (2007-08).

§ 844.01.[13]

SFG also argues that even if there is a cause of action, relief is inappropriate because it is only available to plaintiffs in possession, citing Wisconsin Statute § 844.15(2). (Def.'s Reply Mot. Dismiss 11.) Section § 844.15(2) specifically states that

> [a] person claiming injury or interference who does not have possession, may bring an action under this chapter *only* by alleging that the person with the right to possession refuses to bring the action, and by alleging the efforts which have been made to induce the person with the right to possession to bring the action. The person with right to possession shall be joined as a defendant.

(Emphasis added.)  The Icelandic Entities allege that "[w]ithout resolution of this dispute over the parties' interests, it will be impossible to resolve the issue of who has the right to possession of the Project for purposes of Wisconsin Statutes section 844.15." (Compl. ¶ 238.)  While the Icelandic Entities have attempted to plead around the requirement of § 844.15(2), they do not allege that the person (or entity) with the right of possession refuses to bring the action, they also do not allege efforts that have been made to induce such person to bring the action and have not joined such person as a defendant.  Thus, the Icelandic

---

[13]In a March 6, 2012, decision, the Court of Appeals for Seventh Circuit concluded that Wis. Stat. § 844.01 does not create an independent cause of action; it is a statute that sets forth remedies when a cause of action exists. *See Roundy's v. N.R.L.B.*, Nos. 10-3921 & 11-1292, 2012 WL 752541, at *10 (7th Cir. Mar. 9, 2012).  The appellate court cited *Menick*, 547 N.W.2d at 782 (citing *Shanak*, 518 N.W.2d at 320) and *Schultz*, 640 N.W.2d at 139.  However, the *Roundy's* court did not cite the 2009 Wisconsin Court of Appeals decision which noted that the action for the forced sale of the plaintiff's land to the defendant could be "treated as an action based on interference with a property interest under ch. 844, Wis. Stats. and that under "this chapter, the court may award the legal or equitable relief to which Plaintiff is entitled." *Soma*, 772 N.W.2d at 727-28 (citing § 844.20, Wis. Stats.).  The Seventh Circuit Court of Appeals also did not cite *Liebovich*, 751 N.W.2d at 764.

-61-

Entities have failed to plead a plausible claim for relief under § 844.01 of the Wisconsin Statutes.

Furthermore, the Court notes that Icelandic Entities alleges that "Wisconsin Statutes section 844.18 specifically allows the Icelandic Entities to resolve its property interest claims and to resolve this dispute." (*Id.* at ¶ 239.) However, the cited provision states: "Any person claiming an interest in the property described in the complaint, and claiming that he or she has been, or will be, injured by a defendant's activity may intervene in the action." The provision does not support the Icelandic Entities' claim because they are are not attempting to intervene in this action. Based on the foregoing, Count VII fails to state a cause of action. SFG's motion for dismissal is granted as to Count VII.

*Summary*

In sum, SFG's motion to dismiss is granted as to the unjust enrichment claim (Count I); the promissory estoppel claim (Count II); part of the Wisconsin Statutes Chapter 224 claim (Count III) with respect to the portions of the claim under §§ 224.77(1)(b) and (c), § 224.77(1)(l) relying upon § 224.79(4)(a)(2), § 224.77(1)(k) relying on §§ 224.79(1) and (2); the claim for unclean hands (Count IV); and the claim for interference with interest and physical injury to real property (Count VII).

The motion to dismiss is denied as to that part of the Wisconsin Statutes Chapter 224 claim (Count III) based on the alleged violations of § 224.77(1)(k) (relying on §§ 224.72(4)(d)(1) and 224.72(5)(b)) and §§ 224.77(1)(l), 224.77(1)(m), and 224.77(1)(o);

the claim for a declaration of rights under Wisconsin Statutes § 840.03 (Count V); and the claim for a declaration of interest in real property claim under Wisconsin Statutes § 841.01 (Count VI).

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

SFG's motion to dismiss (ECF No. 47) is **GRANTED** with respect to the following portions of the Complaint: the unjust enrichment claim (Count I); the promissory estoppel claim (Count II); part of the Wisconsin Statutes § 224 claim (Count III) with respect to the claims under §§ 224.77(1)(b) and (c), § 224.77(1)(l) relying upon § 224.79(4)(a)(2), § 224.77(1)(k) relying on §§ 224.79(1) and (2); the claim for unclean hands (Count IV) and the claim for interference with interest and physical injury to real property (Count VII); and is **DENIED** in all other respects.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**